UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANNEL CENTENO, HERIBERTA CENTENO, and JOSE CENTENO, | No. 1:16-cv-00653-DAD-SAB |
| Plaintiffs, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' MOTION IN LIMINE NO. 1 |
| CITY OF FRESNO, ZEBULON PRICE, and FELIPE MIGUEL LUCERO, | |
| Defendants. | (Doc. Nos. 40, 48) |

This case arises from a September 3, 2015 encounter between Freddy Centeno and two officers of the Fresno Police Department. Mr. Centeno was shot by the officers that morning shortly after 11:00 a.m., in the southwest part of Fresno, California. He died weeks later. Plaintiffs—Mr. Centeno's adult daughter and his parents—bring this civil rights action against the City of Fresno and Officers Felipe Miguel Lucero and Zebulon Price. (*See* Doc. No. 1-2.)

On May 16, 2017, defendants' motion for summary judgment came before the court for hearing. Attorneys Cristobal Galindo and Kent Henderson appeared on behalf of plaintiffs. Attorney Anthony Sain appeared on behalf of defendants. After oral argument, defendants' motion was taken under submission. For the reasons stated below, defendants' motion for summary judgment will be granted in part and denied in part.

1

**BACKGROUND**

**A.    Factual Background**[1]

On September 3, 2015, at approximately 11:00 a.m., Paola Hermosillo was with three children in the living room of her apartment unit on South Orange Avenue, in Fresno, California, when Freddy Centeno approached the apartment and banged on her door.  (DUMF ¶¶ 2–3.)  When Ms. Hermosillo went to the door, Mr. Centeno—who was wearing black shorts and no shirt—identified himself as a federal agent, warned Ms. Hermosillo that she was not supposed to be selling drugs at the residence, and asked for someone named "George."  (DUMF ¶ 4, 7.)[2]  Ms. Hermosillo remembered Mr. Centeno from a prior, similar encounter when he had also demanded to see "George," before her husband made Mr. Centeno leave.  (DUMF ¶ 8.)  On this occasion, Mr. Centeno pulled out an object, which Ms. Hermosillo believed to be a gun, and pointed it toward her.  (DUMF ¶¶ 5, 13.)  Ms. Hermosillo closed her door and called 911.  (*Id.*)  As Mr. Centeno walked away from the apartment complex, Ms. Hermosillo relayed this information, as well as a physical description of Mr. Centeno, to an emergency dispatcher.  (*See* DUMF ¶¶ 7, 17.)

Around the time Mr. Centeno had approached Ms. Hermosillo's apartment, Officer Felipe Miguel Lucero and his partner Officer Zebulon Price of the Fresno Police Department ("FPD") were responding to an unrelated matter nearby.  (DUMF ¶ 39.)  Officer Lucero was wearing blue jeans, a t-shirt, tennis shoes, and a black nylon tactical vest with an FPD star on the front left chest and a patch on the back that read "Police M.A.G.E.C."  (DUMF ¶¶ 37–38.)  Officer Lucero was carrying his FPD-issued firearm, a backup firearm, and taser.  (*Id.*)  Officer Price also wore a tactical vest.  (DUMF ¶ 37.)

Sergeant Walter Boston, a supervising officer, approached Officers Lucero and Price and advised them of a call for service involving a subject with a firearm.  (DUMF ¶ 39.)  Sergeant Boston told Lucero that the subject was a Hispanic male, was wearing no shirt and had multiple

---

[1]  The relevant facts that follow are principally derived from defendants' statement of undisputed material fact (Doc. Nos. 41, 42, 52, 58) ("DUMF"); and plaintiffs' statement of undisputed material facts (Doc. Nos. 53, 57) ("PUMF").

[2]  Evidence before the court on summary judgment suggests Mr. Centeno had a history of mental health issues, including diagnoses of schizophrenia or bipolar disorder.  (*See* PUMF ¶¶ 1–8.)

tattoos, was wearing black gym shorts, and was walking northbound on Orange Avenue toward Ventura Avenue. (DUMF ¶ 40.) Sergeant Boston also told Lucero that the reporting party stated that the subject had pulled out a small black handgun, identified himself as a federal agent, and demanded to see someone named "George." (DUMF ¶¶ 41–42.) Officers Lucero and Price got into their vehicle, an unmarked gold-colored Nissan Altima, and headed toward the stated location, with Officer Lucero driving. (PUMF ¶ 20; DUMF ¶ 44.) Officer Price then advised dispatch that he and Officer Lucero were on their way to the scene. (DUMF ¶ 80; *see also* Declaration of Julie Fleming (Doc. No. 40-1) ("Fleming Decl."), Ex. D.) Dispatch rebroadcast a description of a Hispanic male wearing black shorts, no shirt, and with tattoos all over his arms and back, last seen walking northbound on Orange toward Ventura. (*Id.*) The dispatcher further stated that the suspect knocked on the door of the reporting party, identified himself as a federal agent, asked if "George" lived there and if the reporting party had any drugs, and pulled out a weapon. (*Id.*) As Officers Lucero and Price approached Orange Avenue, Price asked dispatch again for a description of the suspect. (DUMF ¶ 82.) Dispatch replied that the suspect was a Hispanic male with black shorts, no shirt, and multiple tattoos, and that he had a small black handgun which he put in his front pocket. (DUMF ¶ 82; *see also* Fleming Decl., Ex. D.)

Officers Lucero and Price turned on their body cameras as their car approached Mr. Centeno's location. (DUMF ¶¶ 45, 86.)[3] As the officers arrived at the intersection of South

---

[3] The officers' body camera videos, presented on summary judgment, have been carefully reviewed by the court. (*See* Fleming Decl., Exs. S, U.) One such video, from Officer Lucero's body camera (Fleming Decl., Ex. S), depicts the following. The defendant officers were driving rapidly southbound on Orange Avenue when they appear to spot Mr. Centeno. At that moment, their car crosses in front of a vehicle travelling northbound in order to pull to the east side curb on Orange Avenue in front of the approaching suspect. At approximately 13 seconds into the video, Officer Lucero, the driver, has his door partially opened as Mr. Centeno walks toward him down the sidewalk with his hands apparently clasped in front of his chest. At 15 seconds into the video, Officer Lucero raises his pistol and aims it at Mr. Centeno. At 16 seconds, Mr. Centeno's right hand enters the pocket of his gym shorts and, at 17 seconds, he appears to take a dark object out of that pocket with his hand still held down below his waist. A fraction of a second later, the first of the officers' shots appears to hit Mr. Centeno, spinning him sideways. At 19 seconds, Mr. Centeno staggers, and by 20 seconds into the video, he has gone to the ground and is lying motionless. At around the 31-second mark, sound appears on Officer Lucero's video for the first time and someone is heard yelling "Get your hands up!" as police call dispatch to report shots fired.

3

Orange Avenue near East El Monte Way, they saw an individual generally matching the suspect's description as given over dispatch, walking northbound on the east sidewalk of Orange Avenue. (DUMF ¶¶ 46–47, 84.) Officer Lucero parked their vehicle facing south along the east curb of Orange Avenue, approximately forty to fifty feet away from Mr. Centeno. (DUMF ¶¶ 48, 50.)

Both officers exited the vehicle and drew their guns, as Officer Lucero identified himself as "Fresno Police" and Officer Price announced "Fresno P.D." (DUMF ¶¶ 52, 54, 87.) Both ordered Mr. Centeno to get on the ground. (*See* DUMF ¶ 55.)[4] Mr. Centeno dropped his hands down to his sides and reached into his shorts pocket with his right hand. (DUMF ¶¶ 55, 87.) Mr. Centeno then began to lift his right hand from his pocket, exposing a small black object, which both officers believed to be a gun. (DUMF ¶¶ 56–58, 88–89.) That object was, in reality, a black plastic spray nozzle. (PUMF ¶ 13; *see* Fleming Decl., Ex. I.)

Officer Lucero ordered Mr. Centeno to get on the ground a second time. (DUMF ¶ 60.) Believing Mr. Centeno to pose a threat to either himself or his partner, Officer Lucero fired his gun five times at Mr. Centeno. (DUMF ¶¶ 63–65.) Officer Lucero first fired three shots when he believed Mr. Centeno began to raise the object from his pocket. (DUMF ¶¶ 65–66.) As Mr. Centeno's body turned to the left, which Officer Lucero interpreted as an attempt to flee, Officer Lucero fired two additional shots. (DUMF ¶¶ 67–69.) Within the same period of time, Officer Price, fearing Mr. Centeno was pulling a gun out to shoot Lucero, fired his gun five times at Mr. Centeno from about thirty feet away. (DUMF ¶¶ 89–90, 93–95.)[5] However, the entire confrontation—from the officers' exiting their unmarked car until the conclusion of the shooting—lasted approximately a mere five seconds. (DUMF ¶ 72; *see also* Fleming Decl., Exs. S, U, V.)[6]

---

[4] According to video evidence from Officer Price's body camera, only two seconds passed from the beginning of the officers' order to Mr. Centeno to get on the ground until he was struck by the first bullet. (Fleming Decl., Ex. U.)

[5] Officer Price was standing behind the front passenger side of the car near the tire and therefore had the protection of the car's engine, transmission, and other metal components. (DUMF ¶ 91.)

[6] A third officer, Sergeant Marcus Gray was also present at the scene, having arrived fifteen seconds before the shooting. (PUMF ¶ 58.) Sergeant Gray did not fire his weapon. (PUMF

Mr. Centeno died on or around September 23, 2017, twenty-three days after his encounter with Officers Lucero and Price. An autopsy was performed on Mr. Centeno's body, which identified eight gunshot wounds. (*See* PUMF ¶¶ 60–69.)

**B.      Procedural Background**

Plaintiffs commenced this action in the Fresno County Superior Court on March 23, 2016. (Doc. No. 1-2.) The case was subsequently removed to this federal court by defendants on May 10, 2016. (Doc. No. 1.) Plaintiffs' complaint states the following claims: (1) violation of the Fourth Amendment of the United States Constitution, based on excessive use of force; (2) violation of the Fourteenth Amendment right to due process; (3) municipal liability based on unconstitutional customs, policies, and practices; and (4) state law wrongful death and survival, based on intentional or negligent conduct.

On March 28, 2017, following the conclusion of discovery, defendants moved for summary judgment in their favor as to each of plaintiffs' claims. (Doc. No. 40.) On May 2, 2016, plaintiffs filed an opposition to that motion. (Doc. No. 51.) On May 9, 2017, defendants filed a reply. (Doc. No. 56.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a

¶ 59.)

5

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, as plaintiffs do here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## DISCUSSION

### A.    Federal Section 1983 Claims

The Civil Rights Act provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, to prevail on a valid claim under § 1983, a plaintiff must prove that (i) the conduct complained of was committed by a person acting under color of state law; (ii) this conduct deprived a person of constitutional rights; and (iii) there is an actual connection or link between the actions of the defendants and the deprivation allegedly suffered by decedent.  *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978); *Rizzo v. Goode*, 423 U.S. 362, 370–71 (1976).

Plaintiffs, as successors in interest to decedent Freddy Centeno and individually, allege violations of the Fourth and Fourteenth Amendments against defendant Officers Lucero and Price.  Plaintiffs also allege liability on the part of defendant City of Fresno ("City") under

*Monell*.

1.      Fourth Amendment Claim

Plaintiffs first allege that defendant Officers Lucero and Price employed unconstitutional excessive force against Mr. Centeno on September 3, 2015.  A claim that a law enforcement officer used excessive force during the course of an arrest is analyzed under the Fourth Amendment's objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Under this standard, "'[t]he force which [i]s applied must be balanced against the need for that force: it is the need for force which is at the heart of the *Graham* factors.'"  *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)); *see also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003). Thus, in light of the facts and circumstances surrounding a law enforcement officer's actions, courts "must balance the nature of the harm and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (citations and internal quotations omitted); *see also Scott v. Harris*, 550 U.S. 372, 383–84 (2007); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *Deorle v. Rutherford,* 272 F.3d 1272, 1280 (9th Cir. 2001); *Liston*, 120 F.3d at 976. "Force is excessive when it is greater than is reasonable under the circumstances."  *Santos*, 287 F.3d at 854 (citing *Graham*, 490 U.S. 386).  Accordingly,

> [a]lthough it is undoubtedly true that police officers are often forced to make split-second judgments, and that therefore not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers is a violation of the Fourth Amendment, it is equally true that even where some force is justified, the amount actually used may be excessive.

*Id.* at 853 (citations and internal quotations omitted).

In considering the pending motion for summary judgment, it is important to keep in mind the following admonition of the Ninth Circuit with respect to the use of summary judgment in cases involving claims of excessive use of force:

/////

8

> Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances. . . . Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."

*Green v. City & County of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citations omitted); *see also Hughes v. Kisela*, 862 F.3d 775, 782 (9th Cir. 2016). In the instant case, while many of the facts before this court are uncontroverted on summary judgment, such as the nature and quantum of the deadly force utilized, there is nevertheless a genuine dispute of material fact as to the reasonableness with which that force was applied.

a. *The Nature and Quality of the Intrusion*

The court begins its analysis by assessing both the type and the amount of force used. *See Bryan*, 630 F.3d at 824; *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). Here, it is undisputed that defendant Officers Lucero and Price fired their weapons at Mr. Centeno a total of ten times from no more than fifty feet away. (*See* DUMF ¶¶ 48, 65, 93–94.) Shooting a suspect with a firearm constitutes use of deadly force. *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 n.9 (9th Cir. 2005) (defining "deadly force" as "force creating a substantial risk of causing death or serious bodily injury") (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th Cir. 2005) (en banc)). It is well established that:

> "[t]he intrusiveness of a seizure by means of deadly force is unmatched." [*Garner*, 471 U.S. at 9.] The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a "fundamental interest in his own life" and because such force "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Id.*

*A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). Accordingly, "[d]eadly force is permissible only 'if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm.'" *Id.* (quoting *Garner*, 471 U.S. at 11).

/////

b.     *The Governmental Interests at Stake*

Having identified the quantum of force at issue, the court must balance that use of that force against the need for such force. *See Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011); *Bryan*, 630 F.3d at 823; *Liston*, 120 F.3d at 976. In analyzing the government's interests at issue, courts must consider a number of factors, including (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight, and any other exigent circumstances. *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016); *Glenn*, 673 F.3d at 872; *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc); *Deorle*, 272 F.3d at 1280. Courts may also consider, when appropriate, whether a warning was given before force was used. *See Deorle*, 272 F.3d at 1285 ("Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible."); *see also Hughes*, 862 F.3d at 779. Ultimately, the court must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Hughes*, 862 F.3d at 779 (internal quotations omitted) (quoting *Bryan*, 630 F.3d at 826); *Mattos*, 661 F.3d at 441.

i.     Severity of the crime at issue

The court first considers the severity of the crime at issue. *Graham*, 490 U.S. at 396; *A. K. H.*, 837 F.3d at 1011; *Deorle*, 272 F.3d at 1280–81. Here, there is no dispute that defendant Officers Lucero and Price responded to the scene based solely on a report that Mr. Centeno had disturbed Ms. Hermosillo in her apartment, and that Centeno was wearing black gym shorts with no shirt, identified himself as a federal agent, demanded to see someone named "George," and brandished what Ms. Hermosillo believed to be a firearm. Any criminal conduct on Mr. Centeno's part had ended before the defendant officers became involved, since Mr. Centeno had left Ms. Hermosillo's apartment door and was merely walking down the street when the officers confronted him. *See A. K. H.*, 837 F.3d at 1011 (finding the government's interest insufficient to justify use of deadly force, in part, because the domestic dispute in question had ended before

police arrived); *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (same); *Mattos*, 661 F.3d at 450. In the light most favorable to plaintiffs, this evidence supports the conclusion that Mr. Centeno's alleged conduct constituted, at most, a misdemeanor offense. *See, e.g.*, Cal. Penal Code § 417(a)(2) (exhibiting a firearm). Therefore, the use of some force—but not deadly force—may have been warranted to effectuate Mr. Centeno's arrest. *But see Bryan*, 630 F.3d at 829 (finding no substantial government interest in using significant force to effect an arrest for misdemeanor violations); *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) (holding that while a misdemeanor offense is "certainly not to be taken lightly," it militates against the use of force where the suspect "posed no threat to the safety of the officers or others.").

ii.     Immediate threat to safety

The second and most important governmental interest factor is whether the suspect poses an immediate threat to the safety of the officers or others. *Hughes*, 862 F.3d at 779; *A. K. H.*, 837 F.3d at 1011; *Bryan*, 630 F.3d at 826; *Smith*, 394 F.3d at 702. It has been recognized that "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Hughes*, 862 F.3d at 780 (quoting *Deorle*, 272 F.3d at 1281); *see also Estate of Diaz*, 840 F.3d at 605; *George*, 736 F.3d at 838; *Deorle*, 272 F.3d at 1281 ("[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."). Moreover, it has long been clearly established "that the fact that the 'suspect was armed with a deadly weapon' does *not* render the officers' response per se reasonable under the Fourth Amendment." *George*, 736 F.3d at 838 (emphasis in original) (quoting *Glenn*, 673 F.3d at 872–73); *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").

In moving for summary judgment, defendant Officers Lucero and Price primarily rely on their subjective beliefs that Mr. Centeno posed an immediate threat to their safety. Specifically, the officers arrived at the scene believing Mr. Centeno had recently brandished a gun, and when they confronted him on the street, he started pulling out of the pocket of his shorts a dark object

they believed to be that weapon. *See, e.g.*, *George*, 736 F.3d at 838 ("If the person is . . . reasonably suspected of being armed[,] a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). However, considering the other objective evidence before the court on summary judgment, there is clearly considerable dispute as to whether Mr. Centeno's behavior could have been reasonably been viewed as posing a threat to the safety of the officers justifying their use of deadly force. Most notably, it is undisputed that Mr. Centeno was not carrying a gun, but rather only a black plastic spray nozzle.[7] He did not make threatening gestures or verbally communicate any threats to the officers. In the seconds after the officers announced themselves, Mr. Centeno never moved into a shooting stance, and in reaching into his pocket, never raised his hand above his waist before the officers fired their weapons. (*See* PUMF ¶¶ 24–25.) No other members of the public were visibly present in the immediate area. Indeed, Sergeant Gray, who was present at the scene, having arrived fifteen seconds before the shooting, did not use his firearm against Mr. Centeno. (*See* PUMF ¶¶ 58–59.)[8] Finally, plaintiffs posit that Mr. Centeno may well not have even understood defendant Officers Lucero and Price to be police officers, given the undisputed evidence that they arrived in an unmarked gold-colored Nissan Altima and were not wearing traditional police uniforms.

/////

---

[7] In connection with this motion, defendants filed a motion in limine to exclude consideration of evidence discovered after the shooting regarding the nature of the black object in Mr. Centeno's possession. (*See* Doc No. 48.) In essence, defendants argue that the fact that the object was a plastic spray nozzle is irrelevant because the officers believed it to be a gun when they shot Mr. Centeno. The court finds this argument unpersuasive. The undisputed evidence on summary judgment is that Mr. Centeno began to pull a black object from his pocket, that the object was in clear view of defendant Officers Lucero and Price, and that defendants considered their subjective beliefs about the object when they decided to use deadly force. Under the Fourth Amendment, this court must consider the "reasonableness" of a particular use of force "from the perspective of a reasonable officer." *Graham*, 490 U.S. at 396. Evidence that the object was not a gun is highly relevant to this inquiry in a number of respects, such as whether a reasonable officer would have perceived the object as something other than a gun, or whether Mr. Centeno posed a threat to the officers' safety. Accordingly, defendants' motion in limine will be denied for purposes of this summary judgment motion.

[8] One inference that may be drawn from this evidence is that Sergeant Gray did not perceive a threat to the officers' safety based upon Mr. Centeno's movements.

12

Drawing all inferences from the evidence before the court on summary judgment in plaintiffs' favor, the court concludes that a reasonable jury could conclude that Mr. Centeno posed no threat to the safety of the officers or the public immediately before the defendants fired their weapons, and that the use of deadly force was unwarranted under these circumstances.

iii.       Active resistance or attempts to evade arrest

The third governmental interest factor to be considered is whether Mr. Centeno actively resisted arrest or attempted to evade arrest by flight. *Deorle*, 272 F.3d at 1280. In this case, it is undisputed that not more than five seconds elapsed between defendants' arrival at the scene and the commencement of their firing of their weapons. The very short duration of the incident alone suggests that Mr. Centeno had little or no time to physically respond to any of the officers' commands. *See Hughes*, 862 F.3d at 781 ("The third factor cited in *Graham*, whether the suspect was resisting or seeking to evade arrest, does not apply as the events in this case occurred too quickly for the officers to make an arrest attempt."); *A. K. H.*, 837 F.3d at 1012 (finding summary judgment precluded where the officer "escalated to deadly force very quickly" by shooting the suspect without warning just as the suspect was taking his hand out of his pocket as instructed). There is certainly no evidence before the court on summary judgment that Mr. Centeno actively resisted the officers. Defendant Lucero has stated that he perceived Mr. Centeno to be fleeing after being initially shot. However, based upon the evidence before this court on summary judgment, including video footage of the incident, it is obvious that a reasonable jury could come to a different conclusion—that Mr. Centeno's body turned as a result of being hit by the officers' initial gun shots. Thus, a reasonable jury could also conclude that Mr. Centeno neither actively resisted nor tried to evade the officers in any way and that no use of significant force, let alone deadly force, was justified here.

iv.       Other considerations

Several additional considerations could militate against finding the individual defendants' use of force reasonable in this case. First, "warnings should be given, when feasible, if the use of force may result in serious injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284; *see also*

13

A. K. H., 837 F.3d at 1012 (noting the lack of a warning that the officer was going to shoot); *Hayes v. County of San Diego*, 736 F.3d 1223, 1234–35 (9th Cir. 2013); *Glenn*, 673 F.3d at 876. There is no evidence before the court suggesting that defendant Officers Lucero and Price gave any warnings of their intention to use their firearms and, indeed, the video evidence of the encounter establishes otherwise.

Second, it is appropriate to consider whether alternative tactics for capturing or subduing a suspect were available to the officers. *Smith*, 394 F.3d at 703 (citing *Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994)); *see also Young v. County of Los Angeles*, 655 F.3d 1156, 1166 (9th Cir. 2011). This is because "police are required to consider [w]hat other tactics if any were available, and whether there are clear, reasonable and less intrusive alternatives to the force being contemplated." *Hughes*, 862 F.3d at 781 (alteration in original) (internal quotations omitted) (citing *Bryan*, 630 F.3d at 831; and *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000)). Here, plaintiffs' expert, Mr. Roger Clark, has opined in his report that the defendant officers could have employed a number of alternative tactics, such as taking cover or using their tasers, which would have afforded them the opportunity to learn that Mr. Centeno was carrying only a harmless spray nozzle, with far lesser risk of death or serious bodily injury. (*See* PUMF ¶ 77.)

Finally, the court notes it is undisputed Sergeant Boston told defendant Lucero that the subject was a Hispanic male who, while wearing black gym shorts and no shirt, had just approached Ms. Hermosillo's apartment door, banged on it, identified himself as a federal agent, and demanded to see someone named "George." (DUMF ¶¶ 40–42.) From this evidence a reasonable jury could easily conclude that the defendant officers were aware that they were about to encounter an individual with mental health issues. The Ninth Circuit has observed:

> This Court has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan*, 630 F.3d at 829. The Court has, however, "found that even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* (citation and internal quotation marks omitted). A reasonable jury could conclude, based upon the information available to [the

14

officer] at the time, that there were sufficient indications of mental illness to diminish the governmental interest in using deadly force.

*Hughes*, 862 F.3d at 781.

Because from the evidence presented on summary judgment, as discussed above, a jury may reasonably conclude that Mr. Centeno posed no immediate threat of harm, did not resist arrest, and did not attempt to evade arrest, it could also conclude that the officers had ample opportunity to give Mr. Centeno warnings and employ alternative tactics before resorting to the deadly use of their firearms.

On balance, there are significant and material disputes of fact regarding whether defendants' use of deadly force was reasonable in light of the governmental interests at stake under the circumstances presented here. Because each of the *Graham* factors could be found to militate against the use of deadly force, defendants' motion for summary judgment as to plaintiffs' claim of excessive force must be denied with respect to plaintiffs' Fourth Amendment claim. *See Hughes,* 862 F.3d at 785; *A. K. H.*, 837 F.3d at 1013; *Green*, 751 F.3d at 1049; *George*, 736 F.3d at 839.

### 2. Fourteenth Amendment Claim

Plaintiffs also assert a Fourteenth Amendment substantive due process claim against defendants for the alleged deprivation of their liberty interests in the companionship and society of the decedent. *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)). Government conduct may offend due process only when it "'shocks the conscience' and violates the 'decencies of civilized conduct.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)); *see also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). An officer's conduct shocks the conscience if he or she acted with either (1) deliberate indifference, or (2) a purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives. *Porter*, 546 F.3d at 1137; *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). The appropriate standard of culpability in a given case turns on whether the officer

had an opportunity for actual deliberation. *Porter*, 546 F.3d at 1138; *accord Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).

> Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

*Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Wilkinson*, 610 F.3d at 554); *accord Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014); *see also Porter*, 546 F.3d at 1139 (holding that the purpose to harm standard is applied where officers found themselves confronting "fast paced circumstances presenting competing public safety obligations").

Here, the undisputed evidence establishes that defendant Officers Lucero and Price faced a quickly-evolving situation in deciding to use their weapons. As a result, the purpose to harm standard must apply to plaintiffs' Fourteenth Amendment claim. Under that standard, plaintiffs argue that defendant Officers Lucero and Price acted with a purpose to harm on two primary grounds. First, plaintiffs speculate, without citing any evidence presented on summary judgment, that the defendant officers could have decided to harm Mr. Centeno before arriving at the scene, based solely on dispatch reports that he was carrying a gun. Second, plaintiffs contend that the extremely short duration of the encounter, by itself, supports the conclusion that the officers acted with a purpose to harm Mr. Centeno. While the evidence identified by plaintiffs is relevant to the question of whether the officers had an opportunity to deliberate in determining what course of conduct to take in engaging Mr. Centeno, it cannot, by itself, also establish an intent to harm him. Accordingly, the court finds no evidence submitted on summary judgment supports a finding that the defendants acted with a purpose unrelated to legitimate law enforcement objectives. Defendants' motion for summary judgment will therefore be granted with respect to plaintiffs' Fourteenth Amendment claim.

### 3. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a

16

reasonable person would have known." *Mullenix v. Luna*, 577 U.S. ___, 136 S. Ct. 305, 308 (2015) (internal quotations omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th Cir. 2003); *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001). When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *accord Pearson*, 555 U.S. at 236–42 (holding that courts need not analyze the two prongs of the analysis announced in *Saucier* in any particular order). Because this court finds that the evidence presented on summary judgment is such that a reasonable trier of fact could find in plaintiffs' favor with respect to their Fourth Amendment claim, it necessarily proceeds to determine whether the rights at issue were clearly established prior to this incident. *See Hughes*, 862 F.3d at 783; *A. K. H.*, 837 F.3d at 1013.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Hughes*, 862 F.3d at 782. In this regard, while a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *see also Hughes*, 862 F.3d at 783; *A. K. H.*, 837 F.3d at 1013; *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry focuses on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional." (quoting *Saucier*, 533 U.S. at 202)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (emphasis in original) (quoting *al-Kidd*, 563 U.S. at 742). This inquiry must be undertaken in light of the specific context of the particular case, rather than as a broad general proposition. *Id.*; *Saucier*, 533 U.S. at 201. Because qualified immunity is an affirmative defense, the burden of proving the absence of a clearly established right initially

lies with the official asserting the defense.  *Harlow*, 457 U.S. at 812; *Tarabochia v. Adkins*, 766

F.3d 1115, 1125 (9th Cir. 2014).  To determine whether defendants are entitled to qualified

immunity, this court must "assume [the officers] correctly perceived all of the relevant facts and

ask whether [they] could have reasonably believed at the time that the force actually used was

lawful under the circumstances."  *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011);

*see also Hughes*, 862 F.3d at 783.

 Here, with the evidence viewed in the light most favorable to plaintiffs, the state of the

law as of September 3, 2015, when this police shooting occurred, clearly gave defendants fair

warning that their use of deadly force was unconstitutional.  The evidence establishes that the

defendant officers perceived the potential threat to their safety based on two sources of

information.  First, in the moments leading up to the encounter, the officers received information

that Mr. Centeno had exhibited a handgun outside a nearby residence and that he put the gun in

his pocket.  Second, upon arriving at the scene, both officers saw Mr. Centeno begin to pull a

black object from his pocket, which they believed to be the reported handgun.  However, based

upon the evidence before the court on summary judgment, the court concludes that a jury could

find that reasonable officers would have correctly perceived the object in Mr. Centeno's hand to

be a black plastic spray nozzle and not a gun and could therefore also find that Mr. Centeno was

in fact unarmed and posed no immediate threat to their safety when he was approached by the

officers.[9]

 The Ninth Circuit has held that defendants are not entitled to summary judgment on

qualified immunity grounds under similar circumstances where the decedent did not have a

weapon, even when the officers subjectively believed the decedent to be armed.  *See, e.g.*,

*A. K. H.*, 837 F.3d at 1009, 1012–13 (affirming the denial of summary judgment on qualified

immunity grounds where the officer testified he shot as the decedent was taking his hand out of

his pocket because the decedent's hand was "concealed" and something in his pocket "appeared

---

[9]  Having reviewed video and photographic evidence showing Mr. Centeno holding the spray nozzle, this court concludes that a jury could find that that a reasonable officer would not have believed Mr. Centeno was pulling a gun from his pocket when approached by the officers.  (*See, e.g.*, Fleming Decl., Exs. I, S, U.)

to be heavy"); *Harris*, 126 F.3d at 1203 (holding that the use of deadly force is unreasonable when a suspect makes no aggressive or threatening movement, despite having allegedly engaged in a shoot-out with officers the prior day). Similarly, the Ninth Circuit has concluded summary judgment on qualified immunity grounds to be inappropriate where it is disputed whether a subject, known to be armed, actually threatened to use their weapon. *See Hughes*, 862 F.3d at 785 ("[A] rational jury—again accepting the facts in the light most favorable to Ms. Hughes— could find that she had a constitutional right to walk down her driveway holding a knife without being shot."); *George*, 736 F.3d at 839 ("Today's holding should be unsurprising. If the deputies indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment."); *Curnow*, 952 F.2d at 325 (9th Cir. 1991) (holding that the use of deadly force is unreasonable when the suspect did not point a gun at officers).

Having viewed the video evidence, *see supra* note 3, the court is convinced that a jury must determine whether the defendants' actions were reasonable under the circumstances. In turn, "[t]he application of qualified immunity in this case will depend upon the facts as determined by a jury." *Hughes*, 862 F.3d at 785. Accordingly, defendants' motion for summary judgment in their favor on qualified immunity grounds must be denied.[10]

### 4. Municipal Liability

A municipality may be liable under § 1983 where the municipality itself causes the constitutional violation through a "policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Therefore, municipal liability in a § 1983 case may be premised upon (1) an official policy; (2) a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (3) the act of an "official whose acts fairly represent official policy such that the challenged action constituted official policy;" or

---

[10] In reaching this conclusion the court has found persuasive Circuit Judge Berzon's recent precise and thorough analysis of how qualified immunity is properly applied in keeping with Supreme Court precedent in cases such as this one. *See Hughes*, 862 F.3d at 785–91 (order denying petition for rehearing en banc) (Berzon, J., concurring).

(4) where "an official with final policy-making authority 'delegated that authority to, or ratified the decision of, a subordinate.'" *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)); *see also Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008).

"[A] custom or practice can be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (citations and internal quotations omitted); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) ("A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded.").

On summary judgment, plaintiffs rely on their expert witness, Mr. Clark, for opinions regarding the defendant City's liability. Specifically, Mr. Clark opines that the Fresno Police Department "appears to have endorsed the dangerous and out-of-policy tactics" in this case. (*See* PUMF ¶¶ 78, 80.) However, Mr. Clark cites no evidentiary basis for this conclusory opinion, such as, for example, an FPD policy or an act by a City official endorsing or ratifying the officers' alleged conduct. Thus, Mr. Clark's opinion with regard to City approval is speculative at best. Mr. Clark also describes his review of evidence related to a separate officer-involved shooting incident involving Officer Price, on March 23, 2016. Based on the review of that evidence, Mr. Clark opines that this incident "indicates a pattern of unnecessarily reckless and dangerous tactical conduct that resulted in excessive and unnecessary lethal force." (*See* PUMF ¶ 79.)

To the extent plaintiffs allege that the City's custom or practice of failing to properly train or discipline officers caused a constitutional violation with respect to Mr. Centeno, it is unclear how Officer Price's alleged conduct in 2016—*subsequent* to his participation in the shooting of Mr. Centeno in 2015—has any relevance to the issue of *Monell* liability in the case before this court. Moreover, plaintiffs have failed to identify any official FPD policy or action, with respect

to Officer Price's subsequent alleged conduct, that could support a finding of liability based on a theory of City ratification. Accordingly, the defendant City is entitled to summary judgment with respect to plaintiffs' constitutional claims against it.

### 5. Punitive Damages

Finally, defendants move to dismiss plaintiffs' request for punitive damages against the individual defendants. To recover punitive damages against an individual officer in a § 1983 case, a plaintiff must show that the officer's conduct is "motivated by evil motive or intent" or "involves reckless or callous indifference to the federally protected rights of others." *See Smith v. Wade*, 461 U.S. 30, 56 (1983); *Dubner v. City & County of San Francisco*, 266 F.3d 959, 969 (9th Cir. 2001). The Ninth Circuit has further explained that "the standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases," which extends to "malicious, wanton, or oppressive acts or omissions." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citing *Wade*, 461 U.S. at 49). Here, viewing the facts before the court on summary judgment in the light most favorable to plaintiffs, a reasonable jury could conclude that defendants' conduct rose to at least a level of reckless disregard for Mr. Centeno's constitutional rights. Accordingly, defendants' motion for summary judgment is denied with respect to plaintiffs' request for punitive damages.

## B. State Law Wrongful Death Claim

In addition to their federal claims, plaintiffs, as successors in interest to decedent Centeno and on their own behalf, also allege a wrongful death claim under state law. A wrongful death cause of action requires (1) a wrongful act or negligence, (2) which causes (3) the death of another person. *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999). Plaintiffs' wrongful death claim is based on the same set of facts giving rise to their Fourth Amendment claim. Because, as noted above, a genuine dispute of material fact exists as to the reasonableness of the defendant officers' conduct, summary judgment with respect to plaintiffs' wrongful death claim against defendant Officers Lucero and Price must also be denied. *See, e.g.*, *Young*, 655 F.3d at 1170 (reversing dismissal of a state law negligence claim where a Fourth Amendment violation sufficed to establish breach of the officer's duty of care).

21

Plaintiffs also allege their wrongful death claim against the defendant City on theories of either (1) direct liability, based on the City's failure to properly or adequately hire, train, or discipline their officers; or (2) vicarious liability, based on the conduct of defendant Officers Lucero and Price. (*See* Doc. No. 1-2 ¶¶ 30–42.) Under the California Tort Claims Act, public entities are generally immune from liability for injuries resulting from negligent hiring, training, and supervision in the absence of a statute providing otherwise. Cal. Gov't Code § 815; *see, e.g.*, *de Villers v. County of San Diego*, 156 Cal. App. 4th 238, 252–53 (2007) ("We find no relevant case law approving a claim for direct liability based on a public entity's allegedly negligent hiring and supervision practices.") (citing *Munoz*, 120 Cal. App. 4th at 1110–15). On summary judgment, plaintiffs have not identified any evidence of specific wrongdoing by City officials with respect to the hiring, training, and supervision of defendant Officers Lucero and Price. Accordingly, the defendant City is entitled to summary judgment with respect to plaintiffs' wrongful death claim against it based upon a theory of direct liability.

However, plaintiffs may proceed on their claim against the City based on a theory of vicarious liability. California law creates liability for public entities for "injur[ies] proximately caused by an act or omission of an employee of the public entity within the scope of his employment . . . ." Cal. Gov't Code § 815.2; *see also San Mateo Union High Sch. Dist. v. County of San Mateo*, 213 Cal. App. 4th 418, 432–33 (2013) ("In addition to limited statutory liability for their own conduct and legal obligations, public entities may incur liability, based on *respondeat superior* principles, for the misconduct of their employees that occurred in the scope of their employment."). Because plaintiffs' wrongful death claim against the defendant officers must be resolved by the trier of fact in this case, summary judgment will also be denied with respect to plaintiffs' claim against the City on a vicarious liability theory.

## CONCLUSION

For the reasons set forth above,

1. Defendants' motion for summary judgment (Doc. No. 40) is granted in part and denied in part;

*/////*

22

2. Defendants' motion in limine No. 1 (Doc. No. 48) is denied for purposes of defendants' motion for summary judgment;

3. Summary judgment is granted in defendants' favor with respect to plaintiffs' Fourteenth Amendment claim;

4. Summary judgment is granted in favor of the defendant City as to all of plaintiffs' *Monell* claims;

5. Summary judgment is granted in favor of the defendant City as to plaintiffs' state law wrongful death claim only to the extent that claim is premised on a theory of direct liability;

6. This action now proceeds only on (1) plaintiffs' Fourth Amendment claim against defendant Officers Lucero and Price, and (2) plaintiffs' state law wrongful death claim against all defendants; and

7. The parties are directed to contact Courtroom Deputy Renee Gaumnitz at (559) 499-5652, or RGaumnitz@caed.uscourts.gov, within fourteen days of service of this order regarding the rescheduling of the Final Pretrial Conference, Jury Trial, and such other hearing dates as may be appropriate in this case.

IT IS SO ORDERED.

Dated:   **August 30, 2017**   _____

UNITED STATES DISTRICT JUDGE